IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | |
|---|---|
| MARIANN MESECHER, § | |
| § | |
| Plaintiff, § | |
| § | |
| v. § | No. 4:15-CV-0859-BL |
| § | |
| NANCY A. BERRYHILL,[1] § | |
| Acting Commissioner of Social Security, § | |
| § | |
| Defendant. § | |

## MEMORANDUM OPINION AND ORDER

Pursuant to 42 U. S. C. § 405(g), Plaintiff seeks judicial review of a decision of the Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act and Supplemental Security Income ("SSI") under Titles XVI of the Act.[2]  *See* Compl. (doc. 1) (seeking judicial review but not specifying the particular provisions). The Commissioner has filed an answer, *see* Def.'s Answer (doc. 10), and a certified copy of the transcript of the administrative proceedings, *see* SSA Admin. R. [hereinafter "R."] (doc. 12), including the hearing before the Administrative Law Judge ("ALJ"). The parties have briefed the issues.  *See* Pl.'s Mem. (doc. 17); Def.'s Br. (doc. 21); Pl.'s Reply (doc. 23). Based upon the parties' Consent to Proceed Before a United States Magistrate Judge (doc. 13), the United States District Judge reassigned the case to the undersigned pursuant to 28 U.S.C. § 636(c).  *See* Order of Transfer (doc. 15). After considering the pleadings, briefs, administrative record, and

---

[1]On January 20, 2017, Nancy A. Berryhill replaced Carolyn W. Colvin as the Acting Commissioner of Social Security. In accordance with Fed. R. Civ. P. 25(d), the Court automatically substitutes her as the named defendant.

[2]Title II governs disability insurance benefits, *see* 42 U.S.C. §§ 401-34, and Title XVI governs supplemental security income for the aged, blind, and disabled, *see id.* §§ 1381-1383. Final determinations under Title XVI are subject to the same judicial review as provided in § 405(g).  *See* 42 U.S.C. § 1383(c)(3). The Court will often refer to Plaintiff as Claimant, a designation used in social security cases.

applicable law, the Court reverses the Commissioner's decision and remands this case for further administrative proceedings consistent with this order.

## I. BACKGROUND

Plaintiff initially claimed disability due to post-traumatic stress disorder ("PTSD"), heart issues, high blood pressure and cholesterol, back problems, seizures, and strokes. R. 216. She filed an application for DIB on July 17, 2012, alleging disability beginning June 30, 2012. R. 119. She filed an application for SSI on August 7, 2012, alleging disability beginning January 7, 2011. R. 136. An attorney filed another SSI application on her behalf on December 6, 2012, alleging disability beginning June 30, 2012. R. 142-44. Through amendment dated February 27, 2013, she changed the alleged onset date for her DIB application to January 7, 2011. R. 122. Her date of last insured ("DLI") passed on December 31, 2011. R. 212. Therefore, the most relevant time period for her applications and the Court's review commenced January 7, 2011, and expired December 31, 2011. However, medical records from outside that time period are relevant to the extent they provide information relative to whether she was disabled within that time period.

The Commissioner denied both applications initially on February 20, 2013, and on reconsideration on May 22, 2013. R. 51-58. On March 13, 2014, Administrative Law Judge ("ALJ") Dan Dane held a hearing on Plaintiff's claims. *See* R. 33-50. On May 30, 2014, the ALJ issued an unfavorable decision finding that Plaintiff was not disabled and was capable of performing work that exists in significant numbers in the national economy. R. 18-26. Applying the sequential, five-step analysis set out in the regulations (20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4)) the ALJ first determined that Plaintiff had not engaged in substantial gainful activity since January 7, 2011, the alleged onset date. R. 20. The ALJ next determined that Plaintiff had the following severe impairments:

migraines, bipolar disorder, and PTSD. R. 20. Third, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or equaled the severity of any impairment in the listings.[3] R. 21-22.

The ALJ then determined that Plaintiff retained the residual functional capacity ("RFC")[4] to perform medium work as defined in 20 C.F.R. §§ 404.1567(c), 416.967(c).[5] R. 22-24. Given her severe mental impairments, she was limited to simple tasks and could "have only superficial contact with the public." R. 22. Based upon the RFC determination and testimony from a vocational expert ("VE"), the ALJ concluded that Plaintiff could not perform her past relevant work as a cook, but could perform jobs that exist in significant numbers in the national economy. R. 24-26. At Step 5 of the evaluative sequence, the ALJ thus found that Plaintiff was not disabled within the meaning of the Social Security Act between January 7, 2011, and the date of the ALJ's decision. R. 26.

On September 16, 2015, the Appeals Council found no reason to review the ALJ decision and thus denied Plaintiff's request for review. R. 1. The ALJ's decision is the Commissioner's final decision and is properly before the Court for review. *See Higginbotham v. Barnhart*, 405 F.3d 332, 334 (5th Cir. 2005) (stating that the Commissioner's final decision "includes the Appeals Council's denial of [a claimant's] request for review").

Plaintiff commenced this social security appeal on November 10, 2015. *See* Compl. She

---

[3] Sections 404.1525 and 416.925 explain the purpose and use of the listings of impairments.

[4] Sections 404.1545(a)(1) and 416.945(a)(1) explain that a claimant's RFC "is the most [he or she] can still do despite [his or her] limitations." When a case proceeds before an ALJ, it is the ALJ's sole responsibility to assess the claimant's RFC. 20 C.F.R. §§ 404.1546(c), 416.946(c). However, that assessment must be "based on all of the relevant medical and other evidence" of record. *Id.* §§ 404.1545(a)(3), 416.945(a)(3).

[5] The regulations address physical exertion requirements and explain: "Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. If someone can do medium work, we determine that he or she can also do sedentary and light work." 20 C.F.R. §§ 404.1567(c), 416.967(c).

3

presents three issues for review, including alleged errors at Steps 3 and 5 and whether the ALJ properly considered opinions of various physicians. *See* Pl.'s Mem. at 4, 9-18.

## II. LEGAL STANDARD

In general,[6] a person is disabled within the meaning of the Social Security Act, when he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). "'Substantial gainful activity' is work activity involving significant physical or mental abilities for pay or profit." *Masterson v. Barnhart*, 309 F.3d 267, 271 n.2 (5th Cir. 2002) (citing 20 C.F.R. § 404.1572(a)-(b)); *accord* 20 C.F.R. § 416.972(a)-(b). To evaluate a disability claim, the Commissioner employs the previously mentioned

> five-step sequential analysis to determine whether (1) the claimant is presently working; (2) the claimant has a severe impairment; (3) the impairment meets or equals an impairment listed in appendix 1 of the social security regulations; (4) the impairment prevents the claimant from doing past relevant work; and (5) the impairment prevents the claimant from doing any other substantial gainful activity.

*Audler v. Astrue*, 501 F.3d 446, 447-48 (5th Cir. 2007). If, at any step, the Commissioner determines that the claimant is or is "not disabled, the inquiry is terminated." *Id.* at 448. The Commissioner must assess the claimant's RFC before proceeding to Steps 4 and 5. *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005). For Steps 1 through 4, the claimant has the burden to show disability, but the Commissioner has the burden at Step 5 to "show that there is other substantial work in the national economy that the claimant can perform." *Audler*, 501 F.3d at 448. If the Commissioner

---

[6]The Act provides an alternate definition of disability for individuals under the age of eighteen, *see* 42 U.S.C. § 1382c(a)(3)(C), and blind individuals who are fifty-five years of age or older, *see* 42 U.S.C. § 423(d)(1)(B). These provisions are inapplicable on the current facts.

carries that Step 5 burden, "the burden shifts back to the claimant to rebut th[e] finding" that he or she can perform other work that is available in the national economy. *Newton v. Apfel*, 209 F.3d 448, 453 (5th Cir. 2000).

"Judicial review of the Commissioner's decision to deny benefits is limited to determining whether that decision is supported by substantial evidence and whether the proper legal standards are applied." *Sun v. Colvin*, 793 F.3d 502, 508 (5th Cir. 2015) (quoting *Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir. 2001)). "Substantial evidence is 'such relevant evidence as a reasonable mind might accept to support a conclusion' and constitutes 'more than a mere scintilla' but 'less than a preponderance' of evidence." *Hardman v. Colvin*, 820 F.3d 142, 147 (5th Cir. 2016) (quoting *Newton*, 209 F.3d at 452). "In applying the substantial evidence standard, the court scrutinizes the record to determine whether such evidence is present, but may not reweigh the evidence or substitute its judgment for the Commissioner's." *Perez*, 415 F.3d at 461. The courts neither "try the questions *de novo*" nor substitute their "judgment for the Commissioner's, even if [they] believe the evidence weighs against the Commissioner's decision." *Masterson*, 309 F.3d at 272. The Commissioner resolves conflicts of evidence. *Sun*, 793 F.3d at 508.

### III. ANALYSIS

This appeal raises the following issues: (1) whether the ALJ properly evaluated Claimant's migraine headache impairment at Step 3 and whether ALJ erred when he included no headache-related limitation in his RFC determination; (2) whether substantial evidence supports the Step 5 denial of benefits when the hypothetical questioning of the VE does not match the determined RFC; and (3) whether the ALJ erred in failing to assign weight to the only examining physician and multiple non-examining consultants. *See* Pl.'s Mem. 4, 9-18.

## A. Step 3

In this case, the ALJ found that Claimant did not have an impairment or combination of impairments that met or medically equaled any listed impairment. R. 21. The ALJ specifically considered Listings 12.04 and 12.06. *Id.* He found mild restriction in activities of daily living (noting an ability to drive, shop, and care for her personal needs); moderate difficulties in social functioning (noting that Claimant "does not socialize and does not enjoy being around crowds") and concentration, persistence, and pace (noting that although Claimant stated that she "has trouble with her memory . . . she was able to remain focused throughout her hearing"); and no episodes of decompensation of extended duration. *Id.* In addition, the ALJ found that Claimant has not experienced repeated episodes of decompensation and she does not have a

> residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or changes in the environment would be predicted to cause [her] to decompensate; or a current history of at least one year of inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

*Id.*

Although Listing 12.04 addresses bipolar and related disorders and Listing 12.06 addresses anxiety disorders and are thus pertinent to Claimant's PTSD and bipolar disorder, neither listing addresses Claimant's severe impairment of migraine headaches. As Claimant points out, Listing 11.03 is the most relevant listing for that impairment and the ALJ did not address it. Pl.'s Mem. at 10-11. While conceding the relevancy of Listing 11.03, the Commissioner argues that Claimant has not carried her burden to show that she meets all requirements of that listing. Def.'s Br. at 6-8.

The Social Security Administration uses Listing 11.03 when evaluating chronic migraine headaches. *See id.* at 6 n.3 (citing Program Operations Manual System (POMS) DI 35405.015).

6

When the ALJ rendered his decision in May 2014, Listing 11.03 provided:

> 11.03 Epilepsy—nonconvulsive epilepsy (petit mal, psychomotor, or focal), documented by detailed description of a typical seizure pattern, including all associated phenomena; occurring more frequently than once weekly in spite of at least 3 months of prescribed treatment. With alteration of awareness or loss of consciousness and transient postictal manifestations of unconventional behavior or significant interference with activity during the day.

20 C.F.R. § 11.03 Pt. 404, Subpt. P, App. 1 (effective Feb. 26, 2014, to December 8, 2014);[7] *accord* Def.'s Br. at 6 n.4 (substituting "Migraines" for "Epilepsy—nonconvulsive epilepsy (petit mal, psychomotor, or focal)").

Claimant directs the Court to SSA National Q&A 09-036 (posted Dec. 15, 2009),[8] which states that "Only active Q&As may be used as guidance in the adjudication of a current claim" and "listing 11.03 (Epilepsy - nonconvulsive epilepsy) is still the most analogous listing for considering medical equivalence." *See* Ex. A at 1, 3 (attached to Pl.'s Mem.). The Q&A recognizes "significant changes in the diagnosis and treatment of migraine headaches" and that not all aspects of Listing 11.03 as set out for epilepsy apply in the context of evaluating migraine headaches. *See id.* 2-4. The Q&A explains that a "diagnosis of migraine headaches requires a detailed description from a physician of a typical headache event (intense headache with more than moderate pain and with associated migraine characteristics and phenomena)." *Id.* at 2. The Q&A sets out the following non-exclusive list of "clinically accepted indicators of the diagnosis": (1) a headache lasting "4 to 72 hours if untreated or unsuccessfully treated"; (2) "Unilateral, pulsating (throbbing) quality" and moderate or

---

[7]The listings of impairments have undergone frequent revisions but the Court finds no need to consider subsequent amendments to Listing 11.03 to resolve the present appeal.

[8]Q&A 09-036 is "yet another guidance document maintained by the Commissioner in addition to the Regulations, Rulings, and POMS." *Merritt v. Comm'r of Soc. Sec.*, No. 15-CV-6633-CJS, 2016 WL 6246436, at *6 (W.D.N.Y. Oct. 26, 2016).

severe pain, worsened by routine physical activity or causing avoidance of such activity; and (3) experiencing nausea, vomiting, photophobia, or phonophobia during the headache (only one needs to be experienced). *Id.* at 2-3.

Through Q&A 09-036, the Social Security Administration "clarified which 'essential components of listing 11.03' may be most relevant when considering whether a claimant's migraine headaches meet or medically equal a listing." *Dunlap v. Colvin*, No. 15-CV-02139-NYW, 2016 WL 5405208, at *9 (D. Colo. Sept. 28, 2016). Based on Q&A 09-036, Listing 11.03 is essentially altered for migraine headaches as follows:

> 11.03 Migraine headaches, documented by detailed description of a typical headache event pattern, including all associated phenomena, e.g., premonitory symptoms, aura, duration, intensity, accompanying symptoms, and treatment; occurring more frequently than once weekly, counting characteristic headache events. With (1) alteration of awareness, which means a condition of being inattentive, or not cognizant of one's surroundings and external phenomena as well as one's personal state or (2) significant interference with activity during the day that may result from, e.g., a need for a darkened, quiet room; lying down without moving; or a sleep disturbance that impacts on daytime activities.

*See* Ex. A at 2-4; *accord Dunlap*, 2016 WL 5405208, at *9; *Plummer v. Colvin*, No. CV-13-08282-PCT-BSB, 2014 WL 7150682, at *10 (D. Ariz. Dec. 16, 2014); *Miller v. Astrue*, No. CV-09-01871-PHX-JAT, 2011 WL 671752, at *12 (D. Ariz. Feb. 17, 2011).

Not only did the ALJ not mention Listing 11.03, *see* R. 18-26, but the Commissioner argues that Clamant's migraine headaches do not satisfy Listing 11.03 as set out for epilepsy, Def.'s Br. at 6-8. Although Claimant provides Q&A 09-036 and relies on it to some extent, the Commissioner simply does not acknowledge it. Because the Commissioner does not contend or argue that Q&A 09-036 is inactive, the Court may utilize it in determining the current appeal. *See Dunlap*, 2016 WL 5405208, at *9 (utilizing Q&A 09-036); *Dawson v. Colvin*, No. SA-15-CV-761-PM, 2016 WL

844836, at *8 n.121 (W.D. Tex. Mar. 1, 2016) (relying on Q&A 09-036 to support using Listing 11.03 for migraine headaches).

The failure to consider a relevant listing is error. *Dawson*, 2016 WL 844836, at *7 (addressing identical issue related to Listing 11.03). Because the ALJ in this case fails to explain how he concludes that Claimant's migraine-headache impairment does not meet § 11.03, he fails to provide this reviewing court sufficient information to determine whether the decision is based on substantial evidence. *See Audler v. Astrue*, 501 F.3d 446, 448 (5th Cir. 2007). The failure of the ALJ does not require remand, however, unless the Court finds prejudice. *See id.*

Under the facts of this case, the error of the ALJ is not harmless. The medical record[9] documents migraine headaches suffered by Claimant since at least October 2011. *See* R. 299. That month, Claimant went to the emergency room ("ER")[10] with complaints of a migraine headache with pain rated as ten out of ten. R. 296. A neurological examination was positive for headaches but there was no "dizziness, weakness, light-headedness and numbness." R. 298. The examining physician diagnosed a migraine headache. R. 299.

Claimant returned to the ER the next month with complaints of right-side weakness, facial droop, slurred speech, and a migraine that had started the day before. R. 308, 416. The reported headache was "similar to previous migraines - right sided throbbing headache with light sensitivity" and that, while driving the night before, "she had to pull over, because of the headlights of oncoming

---

[9]The medical record includes hospital records from JPS Urgent Care Clinic and Texas Health Burleson in addition to records from Viola Pitts Como Clinic and others. *See*, *e.g.*, R. 276-903. Unless the source is particularly relevant, the Court will often refer generically to the hospital or the clinic and may not identify the specific medical practitioner.

[10]Some records utilize the more recent terminology – emergency department ("ED"). The Court will utilize the terminology interchangeably.

traffic." R. 308. Eye examination was "Positive for photophobia." R. 310, 327. Review of gastrointestinal system was positive for nausea but negative for vomiting, abdominal pain, and diarrhea. R. 310. A neurological review was positive for facial asymmetry, difficulty with speech, weakness, and headaches. R. 310, 327. Among other things, the ER diagnosed "complicated migraine." R. 311. The discharge diagnosis was "Complex Migraine." R. 324. The ER physician recorded a past medical history that was positive for migraine headaches, referred Claimant for neurological consult, and opined that "she may have complicated migraine." R. 326, 328, 332. At that consult and after reviewing her gastrointestinal system, the examining doctor noted that Claimant had "nausea associated with headaches" and his neurological review was positive for headache, numbness, and weakness. R. 334.

After a fall, Claimant returned to the ER on April 27, 2012. R. 352. At that time, she complained of right shoulder and arm pain, but denied head trauma, neck pain, headache, and leg pain. *Id.* The next month, Claimant again returned to the ER with complaints of headache and right side weakness. R. 366. She stated that she had a headache with weakness for six days, but she denied vomiting, diarrhea, and other symptoms at that time. R. 368. A review of her gastrointestinal and neurological systems was positive for weakness and headaches, but negative for seizures, nausea, vomiting, abdominal pain, and diarrhea. R. 370. She was diagnosed with migraine headache among other things. R. 371. She was provided information regarding migraine headaches. R. 380-81.

On June 4, 2012, Rekha Alexander, M.D., noted a history of migraine headache for which Claimant used Lidocaine gel that "completely resolved migraine headache." R. 788. Claimant was then on Topamax for her migraines. R. 789. Two weeks later, she presented a "2-3 day history of piercing headache, right sided that was non-responsive to topical lidocaine." R. 790. At that time,

10

she was "positive for facial asymmetry, speech difficulty, weakness, numbness, and headaches." R. 792. She was hospitalized for one day. *See* R. 798. A physician set out the following pertinent history of her then current illness:

> This is a 52-year-old female with multiple medical issues. History of hypercholesterolemia, anxiety, question of seizure disorder. Has had an extensive workup last time when she came in with similar symptoms of headache. She gets numbness in her face, then she has weakness in her arm and leg, which will last for a few hours. The last time she was here, she had an MRI, carotid ultrasound, which basically did not show any occlusive disease and did not show a CVA [(a stroke)]. It was felt that she may have a migraine attack. She could have migrainous headaches. She had been put on Plavix and started on Topamax for headache prophylaxis. She stopped the Topamax within a week or 2 after discharge given the fact that she was waking up with severe headaches and she has never got to follow up with Neurology. She does not take Plavix; states that it interferes with her Nexium. . . . She nowadays treats her headaches with lidocaine gel applied inside her nostrils and a Lidoderm patch applied on her head. She usually has headaches on the right side, as she had yesterday evening; had right-sided headache, which would come and go. It was associated with nausea, photophobia, phonophobia, and nausea and vomiting. . . .

R. 794-95. A review of her systems showed that Claimant had a headache with blurry vision in her right eye, but "no nausea or vomiting at the moment." R. 795-96. She was discharged in good condition the next day after her headache and other symptoms had resolved. R. 798.

On July 16, 2012, Claimant visited Saud Khan, M.D., for follow-up of her "migraine, seizure, [and] possible TIA ([transient ischemic attack, also known as a mini-stroke])." R. 799. Dr. Khan noted that, the month previously, Claimant "had an episode of right sided throbbing headaches, photophobia, phonophobia, nausea, vomiting and left sided numbness and subjective weakness" and for the prior six months had blurry vision in her right eye. *Id.* A system review was positive for blurred vision and diarrhea. R. 800. In addition to assessing migraine headaches, Dr. Khan formed the following relevant assessment: "History of episodes in which she gets right sided throbbing headaches, photophobia, phonophobia, nausea, vomiting, blurred vision and left sided numbness and

11

subjective weakness which can last for 2 days." R. 801. He further assessed a history of TIA and seizures, which a witness-friend "described as staring episodes followed by confusion" and another was "described as shaking all over followed by confusion and sleepiness." *Id.* Given his assessments, Dr. Khan prescribed Amitriptyline for her headaches and instructed Claimant "to follow seizure prevention. (Avoid driving, heavy equipment operation, high altitude, swimming)." R. 802.

Plaintiff returned to the emergency room on July 21, 2012, with a headache that had started three days earlier with associated right-sided numbness from her ear to shoulder. R. 386. She reported that the "headache is characteristic of usual migraines." *Id.* A review of her gastrointestinal and neurological systems was positive for numbness and headaches, but negative for dizziness, light-headedness, syncope, nausea, vomiting, and diarrhea. R. 388. She was diagnosed with headache and paresthesia. R. 389. She was again provided information about migraine headaches. R. 396-97.

Two days later, Claimant visited Dr. Alexander and presented positive signs for speech difficulty, weakness, and headaches. R. 802-03. A nurse recorded that "patient stated that on Wednesday morning she awoke with the worst headache ever and went to the ER in Burleson where they gave her some medication that didn't really help and then two days ago she went to the ER again with the same headache, and no matter what she took the headache would not go away."[11] R. 802. That same day, another physician noted that Claimant had left-sided weakness with headache for three days. R. 803. The symptoms began three to five days before, but did not include dizziness or neck stiffness. R. 804. A neurological review was positive for weakness, headaches, and chronic speech difficulty, but negative for dizziness, vertigo, tremors, light-headedness, and numbness. R. 805. She was diagnosed with "Migraine headache: established and worsening." R. 806.

---

[11] Based on this quoted language, the Wednesday would have been July 18, 2012.

12

Claimant again visited Dr. Alexander on August 13, 2012. R. 809. At that time, the doctor recorded that Claimant (1) "denies any seizures, last seizure more than 2 years ago" and (2) presented symptoms of a migraine headache on her last visit and that she had been seen in ER, but has had no further episodes. *Id.* While obtaining medication renewal on August 30, 2012, Claimant was stable, satisfied with her treatment, and stated "I don't know if I'll ever want to be in crowds again but I'm ok with that." R. 815.

In late September 2012, Dr. Alexander recorded "occasional migraines 2-3 times a month, not taking meds, feels does not need it, says decreasing overall." R. 819-20. Claimant believed she could control her migraines through diet. R. 821.

Early the next month, however, an ambulance transported Claimant to the ED "after family found her on the bathroom floor." R. 833. Claimant stated that "she had a migraine headache . . . and began vomiting in the bathroom and passed out." *Id.* She complained of headache, nausea, and left sided weakness. R. 823. Gastrointestinal and neurological system reviews were positive for nausea, local weakness, weakness, and headaches, but were otherwise negative. R. 825. She was hospitalized for two days with a guarded condition. R. 831. Notably, Claimant asked for "morphine and phenergan or dilaudid and phenergan for her headache," but indicated she was allergic to another medication offered for her pain even though that medication was not on her list of allergies. R. 831. Because the admitting physician suspected that Claimant had "secondary intentions," the physician withheld the requested "narcotics as the administration of narcotics for a headache is not warranted." *Id.* Claimant, nevertheless, received a 12.5 mg dose of Phenergan for nausea because of her allergies to "most antiemetics as well." *Id.* She was ultimately treated with Norco (hydrocodone-acetaminophen) and Phenergan. *See* R. 840-41. Upon discharge, her activities were limited to "as tolerated

13

and no driving while on analgesics." R. 841.

About ten days later, Claimant returned to the clinic with abdominal pain and an inability to "keep food down." R. 842. She was placed on medication for gastroesophageal reflux disease. R. 843. On October 29, 2012, Dr. Alexander saw Claimant following an ER visit that resulted in her admittance for weakness. R. 844. The doctor recorded that Claimant "denies headaches or migraine at time" and "reports controlled by conservative measures." *Id.* The next week, Claimant reported that a recent stroke (CVA) decreased vision in her right eye. R. 845.

On December 20, 2012, Dr. Alexander noted Claimant's history of migraine headaches and added "had eye exam and new glasses, symptoms improved since then and not on any meds." R. 846. The next month, however, Claimant went to the ED complaining of "left sided headache persistent for past two weeks." R. 595. She also complained of "right flank pain with nausea and vomiting today" and had diarrhea the night before. *Id.* Claimant expressed "concerns about her previous history of migraine induced TIA." *Id.* A review of her gastrointestinal and neurological systems was positive for nausea, vomiting, diarrhea, and headaches, but negative for abdominal pain, dizziness, weakness, and numbness. R. 597. She was diagnosed with migraine headache. R. 600. Two weeks later, Dr. Alexander noted that Claimant's migraines had "improved," she was then on Depokote only, and the condition was "stable." R. 856.

Plaintiff returned to Dr. Khan in March 2013 for a follow-up for migraine, seizure, and possible TIA. R. 867. Dr. Khan noted that her last seizure had occurred three years earlier and was described as "spell of unresponsiveness which lasted 5 minutes after the headache episode." *Id.* A review of her various systems was positive for dizziness, nausea, vomiting, diarrhea, numbness, tingling sensation, pass out, generalized weakness, and headaches among other symptoms. R. 868.

14

The doctor essentially made the same assessment as he did in July 2012, but added anxiety attacks and explained that the history of possible TIA was shown by "right sided headache and left sided weakness and numbness." *Compare* R. 801 *with* R. 869. Given his assessments, he continued Claimant on Amitriptyline for her headaches, informed her that she "can try limited amount of pain medication as an abortive treatment," and noted that she had used thirty tablets of Hydrocodone" in the past two years. R. 869.

In November 2013, Claimant went to the ED with headaches, focal weakness, loss of sensation, and speech change that began an hour or two previously. R. 870. She did not experience dizziness, nausea, or vomiting and the "headache [wa]s not associated with aura, photophobia or eye pain." *Id.* The differential diagnosis was stroke, TIA, or migraine. R. 874. She was hospitalized for five days. *See id.* The hospital records set out the following history of her complaint:

> Ms. Mesecher is a 53-year-old female with multiple problems including TIAs, possible seizures, and some kind of spells where she gets confused, with decreased alertness for a few seconds to minutes and then has slow resolution of symptoms. She was playing some game on her telephone when she suddenly felt like a blackout with headache and subsequent left-sided weakness. She is unable to move left upper or lower extremities but no problem with speech or swallowing. She has regained some strength back but still pretty weak. Headache is already better. Denies any dizziness. Denies any seizure. . . . Denies any abdominal pain, nausea, vomiting, diarrhea. . . .

R. 880. The primary assessment was: "Left hemiplegia. This could be a CVA or complex migraine with transient ischemic attack." R. 881. A discharge summary noted treatment of several diagnoses, including complex migraine headaches and resolved left hemiparesis, and further noted that Claimant reported "the onset of a headache with a 'blackout' spell," followed by left arm and leg weakness upon regaining consciousness. R. 884. Her recurrent headaches were considered an active issue requiring a follow-up and she was referred for a neurology appointment with Dr. Khan in two

15

weeks. R. 887.

Before visiting Dr. Khan for neurological follow-up, Claimant saw Dr. Alexander on December 11, 2013. R. 888. With respect to migraines, the doctor noted "watching and controlling triggers." *Id.* A review of her medications showed she was not taking her migraine medication – Amitriptyline (Elavil) and Divalproex (Depakote). R. 888-89. A week later, Claimant appeared before Dr. Khan for follow-up regarding "chronic daily headaches." R. 896. Dr. Khan noted: "7 headaches in the last one week. Patient tried Amitriptyline and caused some strange feeling. The headaches are occipital and pressure type." *Id.* His primary assessment was migraine headaches. R. 898. He again noted her history of throbbing headaches, photophobia, phonophobia, etc. R. 899. He prescribed Nortriptyline for the headaches and instructed her that she could try pain medication as an abortive treatment. *Id.*

In addition to the preceding relevant medical evidence regarding her migraine headaches, Claimant testified that she had had headaches for "a number of years." R. 38-39. She also testified that she experiences migraine headaches "[o]nce, sometimes twice a week"; bright light typically triggers them; and she can usually "get rid of them between a day and a half and three days." R. 39. She goes to the hospital if she cannot get rid of the headache by the third day. *Id.* When she is coping with her migraines on her own, she goes to a room in which she has foiled the windows so that she has "a dark place to go to and pretty much stay in there and come out to eat, rest room and stuff like that." *Id.*

As required for Listing 11.03, the medical record documents Claimant's migraine headaches by detailed description. Furthermore, coupled with the record showing Claimant seeking medical attention for numerous headaches and multiple hospitalizations resulting from her headaches, her

16

testimony that she experiences such headaches once or twice a week provides sufficient support for finding that her headaches occur more frequently than once per week. Additionally, headaches that cause Claimant to black out may qualify as an alteration of awareness. *See Mason v. Colvin*, No. 13-1006, 2016 WL 4734721, at *9 (W.D. Tenn. Sept. 12, 2016) (suggesting that blacking out may qualify). Regardless, Listing 11.03 does not require alteration of awareness when there is significant interference with the claimant's daytime activities. An example of such interference is a need for a darkened, quiet room, and that is precisely the type of environment that Claimant stated she would utilize when she would attempt to get through her migraines without medical intervention.

Given the evidence of record, Claimant has provided medical records and testimony that appears sufficient to carry her burden at Step 3 with respect to Listing 11.03. The Court recognizes that the ALJ found Claimant "not entirely credible." R. 23. He points out that "[s]he denied headaches during two Emergency Room visits in February and March 2013 for gastritis." *Id.* Although the ALJ provides no cite to the record for those visits, the Court has reviewed the pertinent records (R. 517-36, 544-557)[12] and finds no reason to highlight them over the medical record as a whole. Claimant visited the ER in February 2013 with a sore throat, ear ache, nausea, and decreased appetite. R. 517. In March 2013, she returned to the ER because she was unable to keep her medication down and had nausea and vomiting that had persisted. R. 553-54. Although neurological system reviews were negative for headaches on both visits, R. 519, 525, 546 (duplicate entries), she was not at the ER for headaches – as recognized by the ALJ – and the records from these ER visits do not support a global determination that Claimant was no longer experiencing headaches or was experiencing headaches with such infrequency that she necessarily does not satisfy that aspect of Listing

---

[12]Some of these records are duplicates.

17

11.03.  Indeed, even though the system reviews were negative for headaches at those visits, the record as whole shows that she continued to have headaches.  In fact, in a subsequent March 2013 follow-up, Dr. Khan's review of systems was positive for headaches, he assessed migraine headaches, and he prescribed new medication for the condition.  *See* R. 868-69.

Further, although the ALJ recognized that Claimant experiences severe headaches, he found them not disabling and noted that she was "still able to complete most of her activities of daily living, including shopping, cooking, and cleaning" and also noted that, "at her most recent hospital visit, she did not allege headaches."  R. 23.  Neither of these notations provide a sufficient basis to discredit Claimant's testimony regarding the frequency of her migraine headaches.  The ALJ neither stated a disbelief of the frequency of the headaches nor affirmatively determined how many headaches that he believed Claimant experienced on a weekly basis.  Accordingly, even with ALJ's credibility finding, this reviewing court lacks a basis to determine how the ALJ would view her credibility with respect to whether she meets or equals Listing 11.03.  *See Barnett v. Barnhart*, 381 F.3d 664, 670 (7th Cir. 2004) (addressing Listing 11.03 in context of seizures not migraine headaches).

For the foregoing reasons, the Court finds reversible error based on the failure of the ALJ to evaluate Claimant's migraine headaches under Listing 11.03.  Without "some explanation from the ALJ to the contrary," it appears that Claimant would carry her burden to demonstrate that she meets that listing.  *See Audler*, 501 F.3d at 449.  Accordingly, the Court remands this case for additional proceedings at Step 3.  *See id.*  On remand, Claimant or the Commissioner may seek to definitively determine any matter related to Listing 11.03, including but not limited to the frequency of Claimant's migraine headaches.

**B. Other Issues**

Plaintiff also urges the Court to reverse the Commissioner's decision because (1) the ALJ failed to include a headache-related limitation in his RFC determination; (2) the hypothetical questioning of the VE does not match the determined RFC; and (3) the ALJ failed to assign weight to various physicians. Because the Court has already found reversible error by the ALJ, there is no need to further determine whether the ALJ erred in these other respects.

The Court will note, however, that a "failure of the ALJ to include, in the RFC assessment, any limitation as a result of [an impairment] he found to be a severe impairment" may also require reversal. *Martinez v. Astrue*, No. 2:10-CV-0102, 2011 WL 4128837, at *6 (N.D. Tex. Sept. 9, 2011) (recommendation of Mag. J.), *adopted by* 2011 WL 4336701 (N.D. Tex. Sept. 15, 2011); *accord Walker v. Colvin*, No. 3:14-CV-1498-L (BH), 2015 WL 5836263, at *15 (N.D. Tex. Sept. 30, 2015) (discussing *Martinez* and cases on both sides of the issue before finding that they ALJ had committed reversible error on the facts then before the court). *But see Carnley v. Colvin*, No. 3:12-CV-3535-N-BF, 2013 WL 5300674, at *9 (N.D. Tex. Sept. 20, 2013) (accepting recommendation of Mag. J. that distinguished *Martinez* on grounds that the VE had considered seizure limitations even though the ALJ had not incorporated such limitations in the RFC determination); *Martinez v. Colvin*, No. 4:12-CV-542-A, 2013 WL 5227060, at *7 n.17 (N.D. Tex. Sept. 16, 2013) (distinguishing the 2011 *Martinez* case on grounds that the medical evidence did not support any additional limitation); *Adams v. Colvin*, No. 4:12-CV-490-A, 2013 WL 5193095, at *9 (N.D. Tex. Sept. 13, 2013) (same). The circumstances of some cases require "some explanation in the record as to how [a claimant] can suffer from a severe impairment, which by definition must have more than a minimal effect on the [claimant's] ability to work and why such severe impairment would not have had any limitation" on

19

the claimant's ability to work. *Martinez*, 2011 WL 4128837, at *7.

Without making a definitive determination, the Court finds that the circumstances of this case appear to warrant such an explanation, if the ALJ proceeds beyond Step 3 on remand. Of course, "an RFC determination only needs to set forth the limitations that are supported in the record." *Klaus v. Colvin*, No. 4:15-CV-0593-Y-BL, 2016 WL 4573878, at *9 (N.D. Tex. Aug. 4, 2016) (recommendation of Mag. J.), *adopted by* 2016 WL 4539179 (N.D. Tex. Aug. 31, 2016). If the ALJ determines Claimant's RFC on remand, he should identify the particular limitations caused by her migraine headaches or explain how/why that severe impairment does not result in any additional limitation on her ability to work. Furthermore, an additional limitation would require additional VE testimony if the ALJ proceeds to Step 5 of the evaluative sequence. Naturally, hypothetical questioning of the VE should typically match the determined RFC in order to provide substantial evidence to support a Step 5 finding.

## IV. CONCLUSION

For the foregoing reasons and pursuant to the fourth sentence of 42 U.S.C. § 405(g), the Court reverses the decision of the Commissioner and remands this case for further administrative proceedings consistent with this order.

**SO ORDERED this 15th day of March, 2017.**

_____
**E. SCOTT FROST**
**UNITED STATES MAGISTRATE JUDGE**